**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
Jonathan Stern, Esq. (JS 3683)
275 Madison Ave., 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: jstern@rosenlegal.com

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSHUA KUPFNER, Individually on Behalf of All Others Similarly Situated, | Case No. 1:18-cv-06601-(FB) (LB) |
| Plaintiff, | |
| vs. | **[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT** |
| ALTICE USA, INC., ALTICE EUROPE N.V. (f/k/a ALTICE N.V.), PATRICK DRAHI, JÉRÉMIE JEAN BONNIN, ABDELHAKIM BOUBAZINE, MICHEL COMBES, DAVID P. CONNOLLY, DEXTER G. GOEI, VICTORIA M. MINK, MARK CHRISTOPHER MULLEN, DENNIS OKHUIJSEN, LISA ROSENBLUM, CHARLES F. STEWART, RAYMOND SVIDER, GOLDMAN SACHS & CO. LLC, J.P. MORGAN SECURITIES LLC, MORGAN STANLEY & CO. LLC, CITIGROUP GLOBAL MARKETS INC., MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., BARCLAYS CAPITAL INC., BNP PARIBAS SECURITIES CORP., CREDIT AGRICOLE SECURITIES (USA) INC., DEUTSCHE BANK SECURITIES INC., RBC CAPITAL MARKETS, LLC, SCOTIA CAPITAL (USA) LLC, SG AMERICAS SECURITIES LLC, and TD SECURITIES (USA) LLC, | **JURY TRIAL DEMANDED** |
| Defendants | |

Lead Plaintiff Andrea Hadzimachalis and named plaintiffs Garfield Anderson, Stephanie Garcia, and Franck Chauvin, ("Plaintiffs'), by Plaintiffs' undersigned attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to Plaintiffs' own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Altice USA, Inc. ("Altice USA" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action brought on behalf of a class consisting of all persons who purchased or otherwise acquired the publicly traded securities of Altice USA either (i) pursuant and/or traceable to the Company's IPO; or (ii) during the period from June 22, 2017 through November 3, 2017, inclusive, (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which the officers and directors of the Company have or had a controlling interest.

2.      Plaintiffs bring claims against Defendants for violations of Sections 11, 12 and 15 of the Securities Act of 1933 ("Securities Act") and sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

3.      Defendants sold shares in the IPO pursuant to a prospectus (the "Prospectus") filed with the SEC as part of a Form S-l registration statement (the "S-1 Registration Statement," together with the Prospectus are collectively referred to as the "Registration Statement").

4.      Altice USA sold its common stock at $30.00 per share in its IPO, raising over $1.9 billion. The Underwriter Defendants earned over $71 million in fees from the IPO.

5.      Since the IPO, and as a result of the disclosure of material adverse facts omitted from Altice USA's Registration Statement, Altice USA's stock price has plummeted over 40% from the IPO price to trade at $17.40 per share during intraday trading on August 17, 2018, damaging Plaintiff and other Class members.

6.      Altice USA, with its subsidiaries, provides broadband communications and video services in the United States. It is the fourth largest cable provider in the U.S., operating under, among other brands, Altice, Optimum, Lightpath, and Suddenlink. It provides cable services to customers in 21 states, including those in the Tri-State area and south-central regions of the U.S., providing broadband, pay television, telephony services, proprietary content and advertising services. It was formed as the result of acquisitions by Altice N.V., a multinational telecommunications company centered in Europe.

7.      Altice USA was under the control of its parent, Altice N.V., and in turn under the control of the founder of that company, Patrick Drahi, the founder of Altice N.V. who wielded virtually all of the voting authority for Altice USA shares.

8.      At all relevant times, the operations, finances and governance of Altice USA and Altice N.V. were highly interdependent—they shared senior officers and directors; jointly reported quarterly and yearly financial results; and jointly conducted earnings calls with investors and analysts.  Their stock prices reflected investor understanding of this interdependent relationship,

as changes in the value of the parent's and the subsidiary's shares were highly correlated, reacting in tandem to material information disclosed in relation to either. Altice USA was majority-owned and controlled by Altice N.V.; in turn, Altice N.V. was majority-owned and controlled by Drahi. Through related shell entities, Altice N.V. and Drahi owned 75.2% of Altice USA's issued and outstanding shares of common stock and held 98.5% of the voting power of Altice USA's outstanding capital stock. Altice USA admitted its interdependence with Altice N.V. stating, for example, in the Registration Statement that its business "depends, in part, upon the external perceptions of Altice Group's reputation, the quality of its products and its corporate and management integrity."

9.     Altice USA pitched this control relationship as an advantage. Altice claimed that, Drahi's overwhelming control allowed the parent (Altice N.V.) to implement its highly successful and distinctive management strategy, the Altice Way, at all its subsidiaries, including Altice USA. Drahi claimed the Altice Way was the key to Altice N.V.'s success and that Altice N.V.'s implementation of this strategy would ensure the success of its subsidiaries.

10.     The Altice Way is a business strategy of cutting expenses by streamlining operations and simplifying a company's organizational structure, and using the cash saved to invest in improving a cable company's infrastructure and content. The goal is to create a more appealing product to customers and allow the company to generate more revenue and cash flow. The basic idea of the Altice Way is to cut overhead in order to invest in improvements that matter most to customers, allowing Altice to attract more customers and charge higher prices, which provides more money to invest in infrastructure and content, creating a virtuous circle.

11.     The claim that Altice had successfully implemented the Altice Way companywide also served to justify Altice USA's highly unusual payments of management fees to Altice N.V.

4

for implementing the Altice Way. The need to justify these payments led Altice USA to make materially false or misleading statements that claimed that Altice had implemented the Altice Way throughout Altice N.V. and its subsidiaries.   In reality Altice N.V., had never successfully implemented the Altice Way companywide. Indeed, Drahi acknowledged in November 2017 that Altice N.V.'s top management had neglected Altice's French operations for years, which led to poor results.   When the market learned that Altice had not implemented the Altice way companywide, Altice USA's stock price dropped as investors' lost faith in management and its ability to execute the Altice Way strategy as promised.

## JURISDICTION AND VENUE

12.     The claims alleged herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77k, 77*l*(a)(2) and 77o.

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 22 of the Securities Act (15 U.S.C. §77v).

14.     Venue is proper in this District because Altice USA maintains principal executive offices in this District, a substantial portion of the transaction and wrongs complained of, including Defendants' participation in the wrongful acts, occurred in this District, Defendants disseminated the statements alleged to be false and misleading herein into this District, and Defendants solicited purchasers of Altice USA common stock in this District.

## PARTIES

15.     Lead Plaintiff Andrea Hadzimichalis, pursuant to the previously filed certification, acquired Altice USA securities at artificially inflated prices pursuant and/or traceable to the Company's IPO and was economically damaged thereby.

16.     Named Plaintiff Garfield Anderson, pursuant to the previously filed certification, acquired Altice USA securities at artificially inflated prices pursuant and/or traceable to the Company's IPO and was economically damaged thereby.

17.     Named Plaintiff Stephanie Garcia, pursuant to the previously filed certification, acquired Altice USA securities at artificially inflated prices pursuant and/or traceable to the Company's IPO and was economically damaged thereby.

18.     Named Plaintiff Franck Chauvin, pursuant to the previously filed certification, acquired Altice USA securities at artificially inflated prices pursuant and/or traceable to the Company's IPO and was economically damaged thereby.

19.     Defendant Altice USA, together with its subsidiaries, provides broadband communications and video services in the United States. According to the Registration Statement, Altice USA was, at the time of the IPO, a "majority-owned and controlled U.S. subsidiary" of Defendant Altice Europe N.V.  Altice USA operates under, among other brands, Altice, Optimum, Lightpath, and Suddenlink. Defendant Altice Europe N.V. (formally known as and referred to herein as "Altice N.V.") is a Netherlands-based multinational telecom company, founded and controlled by Defendant Patrick Drahi. Altice N.V. was Altice USA's corporate parent and, in turn, was controlled by Defendant Patrick Drahi at the time of the IPO. The Registration Statement refers to Altice N.V. and its consolidated subsidiaries as the "Altice Group."

20.     Shortly prior to the IPO, Altice USA adopted a multi class share structure.  Each tier of Altice USA stock entitled holders to the same rights, except that each share of Altice USA Class A stock entitled the holder to one vote, while each share of Class B stock entitled the holder to 25 votes. Altice N.V., through subsidiaries, was the beneficial owner of the following amounts and percentages of Altice USA stock before and after the IPO.

|  | Class A Shares | | Class B Shares | |
|---|---|---|---|---|
|  | Number | % | Number | % |
| Pre IPO | 57,116,181 | 24.3% | 490,085,674 | 99.9998% |
| Post IPO | 57,116,181 | 24.3% | 490,085,674 | 99.9998% |

21.     Defendant Patrick Drahi ("Drahi") was a controlling shareholder of Altice N.V at all times from before the IPO of Altice N.V. until the present.  He primarily holds his stock in Altice N.V. via Next Alt S.à r.l. ("Next Alt"), of which he is the "sole indirect controlling shareholder" according to the Registration Statement.  At the time of the IPO he beneficially owned 59.37% of Altice N.V. and was treated as beneficial owner of all of the Altice USA Stock that Altice N.V. owned borh before and after the IPO.  He also owned smaller amounts of Altice USA stock through other entities.  The following represents the total number of Altice USA stock that Drahi beneficially owned before and after the IPO.

|  | Class A Shares | | Class B Shares | | |
|---|---|---|---|---|---|
|  | Number | % | Number | % | % of total voting power |
| Pre IPO | 63,923,894 | 27.20% | 490,318,022 | 100% | 98.60% |
| Post IPO | 63,923,894 | 25.8% | 490,318,022 | 100% | 98.50% |

22.     Defendant David Connolly ("Connolly") is and has been the Executive Vice President and General Counsel of Altice USA from August of 2016 to the present.

23.     Defendant Dexter Goei ("Goei") is and has been Altice USA's Chairman, President and Chief Executive Officer ("CEO") since 2016, and was President the Board of Directors of Altice N.V. since September 6 2016.  Prior to that time, Goei had previously been Chief Executive Officer of Altice N.V. until June 28, 2016.

24.     Defendant Charles Stewart ("Stewart") is and was Co-President and Chief Financial Officer ("CFO") of Altice USA since 2015.

7

25.     Defendant Victoria Mink ("Mink") was the Company's Senior Vice President and Chief Accounting Officer ("CAO") from June 2016 to October 2018.

26.     Defendant Abdelhakim Boubazine ("Boubazine") was and is a Co-President and the Chief Operating Officer ("COO") of the Company since 2016, and a director of Altice USA until June 22, 2017. He signed the Registration Statement.

27.     Defendant Lisa Rosenblum ("Rosenblum") was Vice Chairman of Altice USA from 2016 to the present and a director of Altice USA until June 22, 2017. He signed the Registration Statement.

28.     Defendant Michel Combes ("Combes") was a director of Altice from the time of June 22, 2017 until November 9, 2017. He was also CEO of Altice, N.V. from 2016 to November 9, 2017. He was named as a director nominee in the Registration Statement.

29.     Jérémie Bonnin ("Bonnin") is and has been a director of Altice USA from June 22, 2017 to the present.  He was the General Secretary of Altice, N.V. from January 2005 through September 2018. He was named as a director nominee in the Registration Statement.

30.     Dennis Okhuijsen ("Okhuijsen") is and has been a director of Altice USA from June 22, 2017 to the present.  He was the Chief Financial Officer of Altice, N.V. from September 2012 through October 31, 2018. He was named as a director nominee in the Registration Statement.

31.     Raymond Svider ("Svider") is and has been a director of Altice USA from June 22, 2017 to the present.  He is the co-chairman and a managing partner of BC Partners, a large shareholder of Altice USA.  He was named as a director nominee in the Registration Statement.

32.     Mark Mullen ("Mullen") is and has been a director of Altice USA from June 22, 2017 to the present.  He is the co-founder and managing director of Bonfire Ventures.

33.     Defendants Drahi, Connolly, Goei, Stewart, Mink, Boubazine, Rosenblum, Combes, Bonnin, Okhuijsen, Svider, and Mullen are collectively referred to herein as the "Individual Defendants."

34.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") acted as an underwriter for the Company's IPO.

35.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") acted as an underwriter for the Company's IPO.

36.     Defendant Citigroup Global Markets Inc. ("Citigroup") acted as an underwriter for the Company's IPO.

37.     Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") acted as an underwriter for the Company's IPO.

38.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") acted as an underwriter for the Company's IPO.

39.     Defendant Barclays Capital Inc. ("Barclays") acted as an underwriter for the Company's IPO.

40.     Defendant BNP Paribas Securities Corp. ("BNP") acted as an underwriter for the Company's IPO.

41.     Defendant Credit Agricole Securities (USA) Inc. ("Credit Agricole") acted as an underwriter for the Company's IPO.

42.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") acted as an underwriter for the Company's IPO.

43.     Defendant RBC Capital Markets, LLC ("RBC Capital Markets") acted as an underwriter for the Company's IPO.

44.     Defendant Scotia Capital (USA) Inc. ("Scotia Capital") acted as an underwriter for the Company's IPO.

45.     Defendant SG Americas Securities LLC ("SG Americas") acted as an underwriter for the Company's IPO.

46.     Defendant TD Securities (USA) LLC ("TD Securities") acted as an underwriter for the Company's IPO.

47.     Defendants J.P. Morgan, Morgan Stanley, Citigroup, Goldman Sachs, Merrill Lynch, Barclays, BNP, Credit Agricole, Deutsche Bank, RBC Capital Markets, Scotia Capital, SG Americas and TD Securities are collectively referred to herein as the "Underwriter Defendants."

## SECURITIES ACT ALLEGATIONS

48.     Pursuant to the Securities Act, Defendants are strictly liable for material misstatements in offering materials issued in connection with the IPO. The Securities Act claims specifically exclude any allegations of fraud, knowledge, recklessness or scienter, do not "sound in fraud" and are based solely on strict liability and negligence.

### Company Background

49.     Altice N.V. was founded by Patrick Drahi, originally as a regional cable operator in France.  Altice N.V. expanded through acquisition in France and eventually internationally, acquiring cable and telecommunications companies in Israel, the Dominican Republic, the Netherlands, and Portugal.

50.     Altice N.V. entered the US market by purchasing Suddenlink Communications, the 7th largest cable provider in the United States, in a transaction that closed on December 21, 2015. Altice N.V. also acquired a majority stake in Cablevision in a transaction that closed on June 21, 2016, with minority stakes purchased by CPPIB and BC Partners.  These assets were consolidated into subsidiaries of Altice USA.

51.     Altice N.V. has long boasted of a particular management strategy that it calls the Altice Way and claimed that it implemented the Altice Way companywide and within its various subsidiaries.

52.     As Altice USA explained in the Registration Statement, the Altice Way is "our founder-inspired owner-operator culture and strategy of operational efficiency, innovation and long-term value creation for stockholders. In developing and implementing our strategy, we are focused on the following principles, which are part of the Altice Way:

• *Simplify and optimize our organization* through streamlining business processes, centralizing functions and eliminating non-essential operating expenses and service arrangements.

• *Reinvest in infrastructure and content*, including upgrading our HFC network and building out a FTTH network to strengthen our infrastructure capabilities and competitiveness.

• *Invest in sales, marketing and innovation*, including brand-building, enhancing our sales channels and automating provisioning and installation processes.

• *Enhance the customer experience* by offering a technologically advanced customer platform combined with superior connectivity and service across the customer lifecycle.

• *Drive revenue and cash flow growth* through cross-selling, market share gains, new product launches and improvements in our operating and capital efficiency.

53.     The Registration Statement also included the below chart to illustrate the Altice Way:



54.     The Registration Statement stated how Altice USA had experience executing the "Altice Way":

Our CEO and Co-Presidents have substantial experience in communications and media operations, finance and mergers and acquisitions, and a proven track record in executing the Altice Way.

55.     The Registration Statement also stated that Altice USA was already implementing the Altice Way in its U.S. operations, allowing it to deliver strong returns:

> Following the Acquisitions [of the U.S. businesses], we began employing the Altice Way to simplify our organizational structure, reduce management layers, streamline decision-making processes and redeploy resources with a focus on network investment, customer service enhancements and marketing support. As a result, we have made significant progress in integrating the operations of Optimum and Suddenlink, centralizing our business functions, reorganizing our procurement processes, eliminating duplicative management functions, terminating lower-return projects and non-essential consulting and third-party service arrangements, and investing in our employee relations and our culture. Improved operational efficiency has allowed us to redeploy physical, technical and financial resources towards upgrading our network and enhancing the customer experience to drive customer growth. This focus is demonstrated by reduced network outages since the Acquisitions, which we believe improves the consistency and quality of the customer experience. In addition, we have expanded, and intend to continue expanding, our e-commerce channels for sales and marketing.
>
> * * *
>
> [T]he benefits of the Altice Way have already significantly strengthened our financial performance and will continue to do so, allowing us to deliver strong returns.

56.     The Registration Statement stated that Altice USA was favorably positioned to compete in its industry because of the Altice Way:

> [O]ur leading market positions in our footprint, technologically advanced network infrastructure, including our FTTH build-out, our new home communications hub and our focus on enhancing the customer experience, consistent with the Altice Way, favorably position us to compete in our industry.

57.     In the Registration Statement, Defendants' touted that implementing the "Altice Way" significantly benefitted Altice USA.  This increased investors' valuation of Altice and persuaded investors that Altice USA was a sound investment.  Several analysts discussing Altice USA noted the Altice Way as a distinct positive.

13

58.     Guggenheim Partners, in its Initiating Coverage report on Altice USA dated July 11, 2017, issued a Buy rating in part because of the Altice Way, stating:

> ATUS is a subsidiary of Altice N.V., which collectively reaches more than 50mm customers across the U.S., Western Europe, Israel and the Dominican Republic. The company believes (and we agree) that this significant global footprint provides ATUS with competitive advantages beyond those typical for a US-based firm of the same size.
>
> Parent company management organizes its business focus around the "Altice Way"—a five principal structure that guides strategy and operations.

59.     Similarly, Deutsche Bank, in its Initiation of Coverage Report dated July 17, 2017, issued a Buy rating and expressed strong approval of the Altice Way, noting the strong performance of Altice in 2016 and concluding "All eyes in the US cable industry are on Altice as it ponders the question, 'Is the Altice way indeed a better, and sustainable, way to operate?'

60.     Wells Fargo took a more guarded approach to Altice at the time of the IPO, issuing a Market Perform[1] rating in its Initiation of Coverage Report dated July 26, 2017.  Nonetheless, Wells Fargo noted that the viability of the Altice Way is key to Altice USA's success.  Wells Fargo explained that "[w]e have no reason to say that ATUS CAN'T achieve its goals via The Altice Way. But at the same time, there isn't one particular market that we can hang our hat on given all seem to be in some level of transition."

61.     Morgan Stanley, in a report dated August 23, 2017, predicted that the "'Altice Way' can drive roughly ~$1-1.1B of operating expense savings by YE20E, driving industry leading EBITDA margins."

62.     The analyst consensus therefore reflected that the Altice Way was an appealing strategy if it could be implemented successfully, and that the key issue in valuing Altice USA's

---

[1] A "Market Perform" means that the price of a company's stock will mirror the overall market, and is similar to a "hold" rating given by some other analysts.

stock was whether management would be able to successfully execute on the Altice Way. Analysts were also consistent in noting that a key question in determining whether management really could execute on the Altice Way strategy was whether that strategy was successful in Europe.

63.    Altice N.V. also placed a great emphasis on the value of the Altice Way, going so far as to charge large annual fees to subsidiaries, including Altice USA, for implementation of the Altice Way.

64.    Altice USA paid Altice N.V. $30 million in 2017, as stated in the Registration Statement. According to the Registration Statement, this payment is to a "subsidiary of Altice N.V. [which] provides certain executive services, including CEO, CFO and COO services." This fee is separate from and in addition to the compensation Altice USA paid directly to its executive officers.

65.    As Altice USA explained, in a letter to the SEC dated May 17, 2017, this fee was an "annual management fee charged in connection with services provided by Altice N.V. Such management fee represents the charge for consulting, advisory and other services to the Company in connection with our acquisitions, divestitures, investments, capital raising, financial and business affairs. Such services are unique in that they represent very specialized knowledge and skills of executives at Altice N.V. and are not comparable to other services in the market."

66.    As noted in the 2018 Annual Report for Altice N.V., at the end of 2017 Altice terminated the practice of charging a flat "Altice Way" fee to all of its subsidiaries. However, as revealed in Altice USA's 10-Q for the first quarter of 2018, filed May 14, 2018, Altice USA continued to pay this fee to Altice USA up until Altice N.V. distributed all remaining shares of Altice USA to the shareholders of Altice N.V., an event that occurred on May 23, 2018.

67.    In addition to the Altice Way management fee, the Altice USA board approved a discretionary stock option award for Drahi, who was not an employee of Altice USA during 2017.

Altice Altice valued the award at $5,291,321, according to the Amended Annual Report for 2017, filed with the SEC on April 30, 2018. Altice USA stated that the board issued the award "[i]n light of Mr. Drahi's significant and ongoing direct contributions to the development and implementation of the Altice USA, Inc. strategic vision."

68.     This practice of charging management fees was highly unusual and drew skepticism from the press. The Wall Street Journal, in an article dated May 20, 2017 titled "Watch Out for the 'Altice Way' of Doing Business", noted that the practice of charging management fees to subsidiaries in the telecom industry is highly unusual. The article also noted that French authorities had cast skepticism on Altice's practice of charging a fee to a different subsidiary for use of the Altice Way.

69.     In turn, Drahi, despite having retired as CEO of all Altice entities in 2016, charged Altice N.V. a hefty price for his advising services. As the Wall Street Journal noted in an article dated May 25, 2017, Altice N.V. agreed to pay Drahi for his advising it with a stock option award that, depending on the value of Altice, NV's stock price, could be worth €1.1 billion. Altice N.V. has itself acknowledged that this arrangement is wholly unique, acknowledging in its Annual Report for 2017 that Altice N.V. "is not aware of any comparable agreement in the market in which [Altice N.V.] operates and, more specifically, where the consideration is in the form of stock options". Altice N.V. has acknowledged that this arrangement places them out of compliance with corporate governance best practices defined under Dutch law that requires "[a]ll transactions between the company and legal or natural persons who hold at least ten percent of the shares in the company should be agreed on terms that are customary in the market." Altice N.V. attempts to excuse this self-dealing arrangement by claiming that it "better aligns the interests of Next Alt", the vehicle through which Drahi owns most of his shares of Altice, with minority shareholders.

### The Close Ties Between Altice USA and Altice N.V.

70.     Despite carving-out Altice USA as a publicly-traded entity, investors continued to view Altice USA within the context of the broader Altice N.V. corporate structure; indeed, as the Registration Statement stated, Altice USA is simply "the U.S. business of Altice N.V.," while further emphasizing, repeatedly, that "[o]ur management team benefits from Altice Group's experience in implementing the Altice Way around the world."

71.     Investors understand that the value of the shares of a publicly-traded subsidiary will directionally track the value of the shares of the parent entity, such that material information that impacts the parent entity will impact the value of the subsidiary.  Dongnyoung Kim and Tih Koon Tan, in their recent assessment of the correlation between the stock returns of parent corporations and newly created subsidiaries, reached this exact conclusion, writing "the degree of ownership and control of the parent over the newly created security or unit determines dependence in stock returns."  Dongnyoung Kim and Tih Koon Tan, *Ex-post stock return behaviour of corporate restructurings and corporate control*, 15(4) REV. OF ACCOUNT. FIN., 484, 496 (2016).  Similarly, in their study on the effects of earnings announcements by parent and subsidiary corporations on the other's securities prices, R. C. Graham and C. E. Lefanowicz found a direct relationship between earnings announcements by one corporation and security price movement in the other.  R. C. Graham and C. E. Lefanowicz, *Parent and Subsidiary Earnings Announcements and Parent and Subsidiary Valuation*, 28 ACCOUNTING & BUS. RES. 3, 16 (1997).  "[O]ur regressions of security price movements against earnings change variables indicate that price changes occur with the first earnings announcement whether it is the parent's or the subsidiary's."  *Id.*  Altice N.V. and Altice USA were no exceptions.

72.     A statistical analysis of the daily and cumulative returns comparing Altice USA and Altice N.V., net of share splits and dividends, shows beyond seven standard deviations – i.e. a greater than 99.999% certainty – a direct correlation between the two publicly-traded corporations.  Additionally, when compared against five of Altice N.V.'s industry and market capitalization peers, the statistical analysis reveals no correlation in share-price movement.  See Figure 1.

Figure 1. Cumulative Returns for Altice USA, Altice N.V., and Five of Altice N.V.'s Industry and Market Capitalization Peers.



73.     Set as a regression output table, the results in mathematical terms are just as stark. As Figure 2 demonstrates, the daily and cumulative returns of Altice N.V. have a highly statistically-significant relation with the returns of Altice USA, while the peers do not.  First, the estimated slope coefficient on Altice N.V. has a t-statistic of 7.45, which means that it is 7.45 standard deviations away from zero, meaning that the likelihood that there is no relation between the returns of Altice USA and Altice N.V. is less than 0.001%.  In contrast, the returns of the other

five peers do not exhibit any statistically significant relation with the returns of Altice USA.  Their

t-statistics range from -0.16 to 0.28, which are not statistically different than zero.  Furthermore,

the R-squared of the Altice N.V. regression is 23.07%, which implies that 23.07% of the variation

in returns of Altice USA is driven by the returns of Altice N.V., while the highest R-squared of

the five peers does not exceed 0.04%.  The statistical analysis in Figure 2 therefore confirms that

out of all of the companies considered – Altice N.V. and its five peers – only Altice N.V. exhibits

a strong positive relation with its subsidiary Altice USA.

Figure 2. Regression Output Table. Altice USA's Returns as a Function of Altice N.V. vis-à-vis Five of Altice N.V.'s Industry and Market Capitalization Peers.

| Explanatory Variable | Slope | T-statistic | R-squared |
|---|---|---|---|
| **Altice N.V.** | **0.339** | **7.45** | **23.07%** |
| Cyfrowy Polsat S.A. | 0.000 | 0.00 | 0.00% |
| Modern Times Group A.B. | 0.023 | 0.19 | 0.02% |
| NOS, SGPS S.A. | -0.026 | -0.16 | 0.01% |
| Tele Columbus A.G. | 0.009 | 0.07 | 0.00% |
| Telenet Group Holding N.V. | 0.045 | 0.28 | 0.04% |

74.     Altice N.V. decided to take its controlled subsidiary Altice USA public, and to sell

off a large block of the resulting publicly floated shares, in order to pay down the enormous debt

that Altice N.V. had incurred in purchasing the entities that would become Altice USA.  For

example, as the Prospectus stated: "We currently intend to use the net proceeds that we receive

from this offering to redeem a portion of the $2 billion aggregate principal amount outstanding of

the 10.875% Senior Notes due 2025."  Similarly, in its 2Q 2017 Earnings Call, Altice N.V.  stated

"we used some primary proceeds from the Altice [USA] IPO to repay part of the 2025 10 7/8%

senior notes."

75.     Before investing in a highly-levered controlled subsidiary, equity investors

consider both the subsidiary company's debt levels **and** the strengths and weaknesses of its parent

company, including its management strategy.  As stated in the seminal academic analysis of this

issue, Prof. Andrew Chen, *et al*. found that, even where a parent company is silent about its

subsidiary's debt, "implicit guarantees" of subsidiary debt by the parent "are often crucially important in determining the viability of subsidiary operations," particularly "in light of the growing importance of international corporate ventures through the establishment of foreign subsidiaries." Chen, *et al.,* "Valuation of parent guarantees of subsidiary debt: Ownership, risk and leverage implications," 2 PAC. BASIN FIN. J. 391 (1994). Simply put, corporate credit ratings – and the costs incurred when borrowing – are materially impacted by the presence of a parent corporation. The principle reflected in Prof. Chen's and other leading academic analyses was applied in the context of Altice N.V. and Altice USA, confirmed by the conduct of leading credit rating agencies, including Moody's Investor Service and S&P Global Ratings, which have considered the debt of affiliated Altice companies to be largely interchangeable from a financial and markets perspective. For example:

- On May 26, 2015, following Altice USA's announcement that it would purchase Cequal Corp., Moody's Investor Service assigned a B3 rating to Altice USA, a relatively low rating for a borrower, because of "the company's very high leverage, its limited free cash flow and *the parent company's* [i.e. Altice N.V.] aggressive financial policy"; and

- on November 23, 2017, S&P Global Ratings revised its outlook for Altice USA to "negative" based on Altice N.V.'s outsized debt load and the performance of Altice N.V.'s French subsidiary SFR.[2]

---

[2] Scholarly analysis that the cost of debt and the credit risk of controlled subsidiaries is lower than stand-alone companies has been the focus of multiple articles in recent years. *See e.g.,* William H. Beaver, et al., *Group Affiliation and Default Prediction*, 65(8) MGMT. SCI. 3559 (2019); Francesca Franco, et al., *Corporate Diversification and the Cost of Debt: The Role of Segment Disclosures*, 91(4) THE ACCT. REV. 1139 (2016); Michela Altieri, et al., *Why Do Parent Companies Guarantee Their Subsidiaries' Bonds? The Dark Side of Separate Legal Liability*, SSRN (2016),

76.     Further, prior to a subsidiary trading in the equity markets, investors assess the subsidiary's earnings and assign it a valuation by scrutinizing the parent's pre-carve-out segment data.  A team of researchers at the London Business School and University of Illinois found that "publicly reported segment disclosures likely play an important role in debt investors' credit risk assessments."  Francesca Franco, et al., *Corporate Diversification and the Cost of Debt: The Role of Segment Disclosures*, 91 THE ACCOUNT. REV. 1139 (2016).  Similarly, research by Belen Blanco, et al., found "a negative relation between better segment reporting," particularly geographic segment disclosures, and the "cost of equity capital."  Belen Blanco, et al., *Segment Disclosure and Cost of Capital*, 42 J. OF BUS. FIN. & ACCOUNT. 367, 402 (2015).   In other words, the more a corporation discloses about its geographic earnings, the easier it is for them to raise money through the sale of publicly-traded securities.  Similarly, an assessment by Wayne B. Thomas of segment information required to be disclosed under the Financial Accounting Standards Board's then-recently issued Statement of Financial Accounting Standards ("SFAS") Rule 14 concluded that "geographic segment earnings disclosures under SFAS 14 provide value-relevant information."  Wayne B. Thomas, *The Value-relevance of Geographic Segment Earnings Disclosures Under SFAS 14*, 11 J. OF INT'L FIN. MGMT. AND ACCOUNT, 152 (2000).  Taken together, these articles highlight that investors care deeply about segment reporting and utilize it before valuing an investment.  Therefore, should the parent experience shortcomings that impact its other segments, investors may reconsider the valuation they had initially assigned the subsidiary.

---

https://papers.ssrn.com/sol3/Delivery.cfm/SSRN_ID3339157_code2385
420.pdf?abstractid=2849420&mirid=1;  Hae-Young Byun, et al., *Business group affiliation, ownership structure, and the cost of debt*, 23 J. OF CORP. FIN. 311 (2013); Radhakrishnan Gopalan, et al., *Affiliated firms and financial support: Evidence from Indian business groups*, 86 J. OF FIN. ECON. 759 (2007).

77.     This was the case here.  Prior to the IPO, Altice N.V. reported its U.S.-based earnings side-by-side with its earnings of other members of the Altice Group.

Figure 3. Altice N.V.'s Segmented Revenues for the Year-Ended December 31, 2016, Reported on its Form 10-K (Published April 7, 2017).

| (€m) | France[1] | US[2] | Portugal | Israel | Dominican Republic | Others[3] | Total |
|---|---|---|---|---|---|---|---|
| **Standalone revenues** | **10,990.5** | **5,436.1** | **2,311.5** | **955.5** | **717.5** | **722.7** | **21,133.9** |
| Intersegment eliminations | (44.6) | - | (35.5) | (0.4) | (5.3) | (292.3) | (378.1) |
| **Group consolidated revenues** | **10,945.9** | **5,436.1** | **2,276.0** | **955.0** | **712.2** | **430.5** | **20,755.7** |
| Purchasing and subcontracting costs | (3,843.8) | (1,714.7) | (507.4) | (235.9) | (144.7) | (88.1) | (6,534.7) |
| Other operating expenses | (2,245.0) | (745.8) | (407.7) | (220.8) | (164.7) | (149.0) | (3,932.9) |
| Staff costs and employee benefit expenses | (945.0) | (827.9) | (281.5) | (67.2) | (30.0) | (135.7) | (2,287.3) |
| **Total** | **3,912.1** | **2,147.7** | **1,079.5** | **431.1** | **372.9** | **57.6** | **8,000.8** |
| Stock options and other adjustments in EBITDA | 4.0 | 62.3 | - | - | - | 18.7 | 85.1 |
| **Adjusted EBITDA** | **3,916.1** | **2,209.9** | **1,079.5** | **431.1** | **372.9** | **76.4** | **8,085.8** |
| Depreciation and amortisation | (2,565.1) | (1,539.8) | (770.5) | (331.2) | (165.1) | (205.3) | (5,576.9) |
| Stock options and other adjustments in EBITDA | (4.0) | (62.3) | - | - | - | (18.7) | (85.1) |
| Other expenses and income | (540.8) | (235.4) | (95.8) | (22.8) | (22.6) | 114.6 | (802.9) |
| **Operating profit** | **806.2** | **372.4** | **213.1** | **77.2** | **185.2** | **(33.1)** | **1,621.0** |

78.     In 2016, Altice N.V.'s U.S.-based operations were its second most important source of revenue and profit, behind only France.  When Altice N.V. reported poor performance in France in 2Q and 3Q 2017, shortly after Altice USA's IPO, investors revisited Altice N.V.'s prior segmented data and revalued Altice USA accordingly.

79.     Moreover, investors continue to closely monitor corporate parent earnings after a subsidiary's carve-out.  It is well-documented that where parent corporations experience earnings trends, their subsidiaries will experience similar trends, particularly where the parent and subsidiary operate in different countries.  For example, in their assessment of non-European subsidiaries of European-based parent corporations, Dhammika Dharmapala and Nadine Riedel Dhammikan found "a significantly positive impact" on the earnings of the non-European subsidiary when the European parent experiences positive earnings themselves.  Dharmapala and

Nadine Riedel, *Earnings shocks and tax-motivated income-shifting: Evidence from European multinationals*, 97 Journal of Public Economics 95, 96 (2013). Altice N.V. and Altice USA fit squarely within this mold. Therefore, when Altice N.V. revealed a decline in earnings in 2Q and 3Q 2017, investors expected a similar decline in Altice USA and investors revalued Altice USA's shares accordingly.

80. Nor are investor concerns limited to earnings and balance sheet performance. In their study of "reputation risk spillover" between cross-border corporate parents and subsidiaries, Nan Zhou and Heli Wang found that, as here, a subsidiaries' corporate reputation is intertwined with that of the parent, particularly where the parent exerts a high degree of control over the subsidiary. Nan Zhou and Heli Wang, *Foreign subsidiary CSR as a buffer against parent firm reputation risk*, J. INT'L. BUS. STUD. (2020). Therefore, as Altice N.V.'s reputation suffered in Europe, Altice USA faced similar consequences.

81. At all relevant times, the closeness of the relationship between Altice USA and Altice N.V. was further illustrated by the significant overlap of shared directors and officers between the two companies, a factor equity investors consider when assessing how closely tied a subsidiary is to its parent. Vladimir Atanasov, et al., *Law and Tunneling*, 37(1) THE J. OF CORP. LAW 1 (2011). For example, in 2016, the person chosen to serve as Altice USA's Chairman and CEO – Defendant Goei – was the then-CEO of the Altice Group and President of the Altice N.V. Board. Although Defendant Goei temporarily relinquished his position as Altice Group CEO after becoming Altice USA's CEO in 2016, from 2016 through the IPO, Goei simultaneously served as: (i) director, Chairman, and CEO of Altice USA; and (ii) a member and President of the Altice N.V. Board. Beginning in November 2017, Defendant Goei was re-appointed to his prior position

as CEO of the entire Altice Group – while also continuing to serve as director, Chairman, and CEO of Altice USA.

82.     Similarly, Defendant Combes, another Altice N.V. director who succeeded Defendant Goei as Altice Group CEO in 2016, thereafter simultaneously served in those positions **and** as a director of Altice USA from 2016 and through the IPO (until he resigned from all of his Altice positions in November 2017).  In addition, Defendant Okhuijsen, the Altice Group's CFO, was listed in the Registration Statement as an incoming director of Altice USA and thereafter served in that role while also continuing to serve as the Altice Group's CFO.  Similarly, Defendant Bonnin, another Altice N.V. director (and its General Secretary) was listed in the Registration Statement as an incoming director of Altice USA and thereafter served in that role while also continuing to serve as a member of the Altice N.V. Board.

83.     Altice N.V.'s control over Altice USA, the sharing of resources between the companies, and the overlap of officers and directors ensured that there was a free flow of information regarding strategies, successes or failures, and other business issues that might threaten the future growth and success of either company.  Moreover, given the close relationship between Altice USA and Altice N.V., it was not surprising that the Registration Statement would also state that Altice USA's "ability to attract and retain customers depends, in part, upon the external perceptions of Altice Group's reputation, the quality of its products and its corporate and management integrity."

**IPO Background**

84.     On April 11, 2017, the Company filed a registration statement on Form S-1 with the SEC in connection with its IPO. The registration statement was subsequently amended, with the final amended registration statement on Form S-1/A filed on June 21, 2017 with the SEC. The

Registration Statement was declared effected by the SEC on June 21, 2017.  Immediately prior to the IPO, Altice NV created a multiple share class structure, giving the shares owned by Altice N.V. and in turn controlled by Drahi, disproportionate voting rights over Altice USA, and ensured that Drahi could exercise total control over Altice USA.

85.     Because of Drahi's overwhelming voting majority over Altice N.V. and Altice USA, the Registration Statement identified Altice USA as a controlled company which was not required to and in fact would not have a majority of independent directors.

86.     On June 22, 2017, Altice USA priced its IPO at $30 per share and sold 71,724,139 shares of common stock, including the underwriters' full exercise of their option to purchase 7,781,110 to cover over-allotments, for gross proceeds of $1,918,290,870.00

<u>**Materially False and Misleading Statements**</u>

87.     The Registration Statement stated the "Altice Way" had already been "successfully implemented across [the] Altice Group" and that implantation of these principles would "distinguish" Altice USA from its "U.S. industry peers and competitors."

88.     The Registration Statement emphasized Altice N.V.'s above average stock returns to shareholders in order to demonstrate the effectiveness of the Altice Way:

> [T]he benefits of the Altice Way have been demonstrated by Altice N.V.'s performance, which is reflected in the 42% average annual total return of Altice N.V.'s Class A ordinary shares since its initial public offering in January 2014 through March 31, 2017, compared to the 5% average annual total return of the STOXX Europe 600 Telecommunications Index, of which Altice N.V.'s Class A ordinary shares are a component, during the same time period.

89.     The Registration Statement emphasized how Altice USA's management would benefit from the Altice Group's experience:

[Altice USA's] management team benefits from Altice Group's experience in implementing the Altice Way around the world.

* * *

Altice Group also cross-deploys talent and expertise across its businesses, allowing [Altice USA] to benefit from our senior management's experience in successfully implementing the Altice Way around the world. We believe this diversity of experience differentiates us from our more traditional U.S.-centric industry peers.

90.     The foregoing statements were materially misleading in claiming that the Altice Way had been successfully implemented across Altice N.V. and its subsidiaries, whereas, in reality, Altice N.V. had not successfully implemented the Altice Way in France.

### The Truth Gradually Emerges

91.     On November 2, 2017, after the close of trading, Altice N.V. issued a pro forma earnings release discussing the financial results for the third quarter of 2017 of both Altice N.V. and Altice USA., with Altice N.V. announcing severely declining revenue, EBITDA margin, and EBITDA in one of its largest markets, France, as follows:

- a "revenue decline in France of -1.3%" year over year;

- "France [EBITDA] margin decreased by -0.7% pts to 36.6% "; and

-  a "€1,009m France (SFR) Adjusted EBITDA, down -3.2% . . . €265m Portugal Adjusted EBITDA, down -1.3%.

92.     On November 3, 2017, Altice USA and Altice N.V. held a joint conference call with market analysts, during which Defendants Combes, Goei, and Okhuijsen responded to analysts' concerns over these disappointing financial results and underlying trends.

93.     During the call, Defendant Combes, inter alia, admitted to problems in France and Portugal:

We are intensifying the operational focus to improve customer experience in Europe. Not everything is going right here at the moment. So we are working hard to address this.

\* \* \*

We are aiming for much better performance in both France and Portugal than you can see in the Q3 numbers.

\* \* \*

[W]e have seen a year-over-year deterioration in both France and Portugal in Q3 as a result of mismanaged rate events in both countries. We have specific action plans to return these businesses to growth as we are addressing all the areas where we have been at a competitive disadvantage and losing customers.

[Emphasis added.]

94.    On this news, Altice USA shares declined $1.91, a drop of 7.8%.

95.    Analysts noted that this decline in Altice USA stock was due to investors' lack of confidence in Altice management due to the disappointing results in Europe.

96.    Wells Fargo issued a report on November 5, 2017, downgrading its earnings estimate for Altice USA and connected this dimmer view to questions about the efficacy of the Altice Way:

> Throughout ATUS's IPO process, we consistently heard about the implementation of "The Altice Way" as the primary means to superior margin performance. Even on today's call, mgmt. spoke of continued "European operating strategies" that are expected to lead to better U.S. expense trends. Unfortunately, the results in Europe don't necessarily inspire confidence, in our view, with both France and Portugal underperforming and actually posting NEGATIVE and DECELERATING rev and EBITDA growth of -1.3%/-3.1% and -3.2%/-1.3% respectively (the parent's stock was -23% vs. the S&P's +0.3% today as a result). While we appreciate there may have been some things out of mgmt's control (such as aggressive competition), these types of issues occur in the U.S. as well and re-raise the question: "can sustainable revenue growth occur with such deep cost cutting measures?" We still don't know, so remain in "wait and see" mode.

97.    Pivotal Research Group, in a report dated November 8, 2017, stated the decline in Altice USA stock was due to the weaker than expected results in France.  Pivotal elaborated in a

subsequent report dated December 4, 2017, that these results led investors to question "the ultimate effectiveness of the 'Altice Way.'". Similarly, on November 14, 2017, RBC Capital Markets similarly attributed Altice USA's decline due to trouble at Altice N.V.

98.     This news also damaged lenders' faith in Altice NV and Drahi's leadership. According to an article in the Financial Times dated December 4, 2017, in November, Goldman Sachs moved to cut its debt exposure to Altice NV by attempting to resell part of a loan it had made. The article also revealed that "Altice's larger lenders have also provided private financing to Mr Drahi himself, adding to their overall exposure to the group."

99.     Major investors also soured on Altice NV. French fund manager Carmignac Gestion, which had previously been one of the largest institutional shareholders of Altice, liquidated almost its entire position as a result of the poor results in France, according to an article in the Financial Times published on February 15, 2018. "A person familiar with Carmignac's thinking said that the 'game changer' for its investment case in Altice was the poor result in France in November, as the group had put a lot of faith in Mr Combes' ability to turn round operational performance in the country."

100.     On November 14, 2017, Defendants Goei and Okhuijsen were scheduled to appear at a Morgan Stanley TMT Conference. Drahi made a surprise appearance where he revealed that Altice N.V. had never fully implemented the Altice Way in France and, by extension, its implementation in the U.S. would not be as successful as the Company touted, stating in relevant part:

> [I]f we referred to France, we never applied the Altice Way from A to Z is what I tried to explain before. . . . [W]e still have a lot of problems with our customers only in France and this is because we didn't precisely apply the Altice Way.

28

101.    In addition to damaging Altice USA's reputation in the eyes of investors, these developments also led Drahi to divert money and personnel away from Altice USA and towards European operations. n November 9, 2017, Drahi announced a management and governance reorganization at both Altice N.V. and Altice USA. Drahi revealed that Combes had resigned as CEO of Altice N.V. and that Goei would replace them. Drahi also made clear that Goei would, simultaneously, continue to serve as Chairman and CEO of Altice USA and a director of Altice N.V

102.    Next, Altice N.V. announced on January 8, 2018 that the board of directors of Altice N.V. approved plans to spin Altice USA off by distributing its shares to the shareholders of Altice N.V. Because Drahi was the majority owner of Altice N.V. shares, this distribution would still result in Drahi maintaining control of Altice USA. At the same time, Altice N.V. announced that Altice USA would issue a $1.5 billion cash dividend immediately prior to completion of the distribution of Altice USA shares to Altice N.V. shareholders. Altice USA would finance this dividend by taking on additional debt. This dividend went against the strategy that Altice USA articulated in the Registration Statement, as well as the priorities set forth in the Altice Way. As the Registration Statement explained, one of the components of the Altice Way is to dedicate cash flow to priorities such as improving infrastructure, purchasing content, and investing in sales and advertising. In addition, the Registration Statement stated repeatedly that Altice USA was unlikely to issue dividends for the foreseeable future due to Altice USA's level of indebtedness. This dividend, of course, increased that level of indebtedness.

103.    Thus, Altice USA's stock price decline resulted from the poor performance of Altice N.V. in Europe caused by Altice N.V. failing to implement the Altice Way in France. This decline caused US investors to question the value of the Altice Way and management's expertise

and ability to execute the Altice Way successfully in the US and caused the decline in Altice USA's price.

104.    As a result of the foregoing, Altice's stock declined precipitously. As of the filing of the initial complaint in this action, Altice's common stock traded at a closing price of $17.22 per share, a decline of 42.6 percent from its IPO price to the public of $30.00 per share

## EXCHANGE ACT ALLEGATIONS

105.    Plaintiffs repeat and reallege the allegations above as fully set forth herein.

### Additional Scienter Allegations

### Additional Scienter Allegations with Respect to Goei

106.    Defendant Goei had motive to commit fraud because he has an overwhelming financial incentive to remain employed at Altice USA, Altice N.V., or an affiliate, and such employment is wholly subject to the discretion of Drahi.  On February 13, 2017, Goei received a grant under Altice USA's "Carry Unit Plan[3]" of 10,600,000 time-vesting Units, scheduled to vest on January 31, 2020, subject to his continued employment with Altice USA or any of its affiliates, worth $40,280,000, according to Altice's 2017 10-K/A. In addition, in 2017 he received a $ 10,582,642. He also received substantial "perquisites" that included personal use of company helicopters and a fixed wing aircraft, valued for 2017 by the company at $287,502 and personal use of company vehicles and drivers, valued at $ 391,634.  These other forms of compensation greatly exceeded Goei's base salary of $490,385.  Because Drahi controlled Altice N.V. and Altice

---

[3] As the Registration Statement explained, the "Carry Unit Plan" is a vehicle to provide certain individuals, including executives of Altice USA, "with an opportunity to participate in the long-term growth and financial success of our operations."  Under the Carry Unit Plan, participating individuals receive "units" – similar to stock, in the Neptune Management Limited Partnership. Neptune Management, in turn, owns Altice USA stock.  A Unit functions in practice like an option – a person who receives a unit is entitled to profits from any appreciation in value of the Units

USA, Goei was dependent for this windfall on protecting Drahi's interests at Altice USA. Therefore, he had motive to make false statements regarding the efficacy of the Altice Way to justify the large payments to Altice N.V. and Drahi.

107.    Goei also had motive to commit fraud due to the extent to which he is beholden to Defendant Drahi.  As controlling shareholder of Altice USA and Altice NV, Drahi has the power through his control of the boards of those companies to terminate Goei, and to control his compensation.  For instance, on November 2, 2018, the board of Altice USA, which Drahi controlled, approved a change to the Long Term Incentive Plan according to which Goei and other Altice USA executives received discretionary option awards, expanding the maximum number of options they may receive.  This amendment was subsequently approved not at a shareholder meeting, but unilaterally by Drahi.

108.    Defendant Goei also had knowledge of the fraud due to his role as President the Board of Directors of Altice N.V.  In that capacity he oversaw the implementation of the Altice Way across Altice N.V. and all of its subsidiaries, including the French operations where Altice failed to implement the Altice Way.  Altice N.V. received payments from all Altice subsidiaries for implementation of the Altice Way and therefore knew, or was reckless for not knowing, that the Altice Way was not successfully implemented.

**Additional Scienter Allegations with Respect to Altice USA**

109.    Goei's scienter can be imputed to Altice USA because of his position as CEO and the fact that he signed the registration statement.  In addition, Drahi's knowledge can be imputed to Altice USA due to his role as controlling shareholder.  Drahi had motive to commit fraud because claiming that the Altice Way had been implemented companywide allowed Altice N.V., and in turn Drahi, to collect large consulting fees for use of the Altice Way, not only from Altice

USA, but also across the organization.  Drahi, as the person responsible for deploying the Altice Way company wide, knew, or was reckless for not knowing, that the Altice Way had not been implemented France.  In fact, during the November 14 Morgan Stanley TMT conference, Drahi acknowledged that part of the reason the Altice Way had not been implemented in France was because he had not had the time to attend to matters in France which required his personal attention.

## **PLAINTIFFS' CLASS ACTION ALLEGATIONS**

110.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons other than defendants who purchased or otherwise acquired the publicly traded securities of Altice USA pursuant and/or traceable to the Company's IPO and who were damaged thereby and/or between the dates of June 22, 2017 and November 3, 2017 (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which the officers and directors of the Company have or had a controlling interest.

111.    The members of the Class are so numerous that joinder of all members is impracticable. Since the IPO, the Company's securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

112.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

113.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

114.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a.    whether Defendants issued materially false and misleading statements;

    b.    whether the Registration Statement was negligently prepared and contained materially misleading statements and/or omitted material information required to be stated therein;

    c.    whether other statements issued by Defendants were materially misleading and/or omitted material information;

    d.    whether Defendants acted with reckless disregard for the truth with respect other statements;

    e.    whether the Company's securities traded on an efficient market; and

    f.    the extent to which members of the Class have sustained damages and the proper measure of damages

115.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

116.     Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Altice USA securities are traded in efficient markets;

- Altice USA shares were liquid and traded with moderate to heavy volume during the Class Period, with 1,629,101 shares trading on average per day;

- Altice USA traded on the NYSE, and was covered by at least 15 analysts during the Class Period;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased and/or sold Altice USA securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

117.     Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

118.     Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I
### Violations of Section 11 of the Securities Act
### Against the Section 11 Defendants

119.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

120.    This cause of action is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against Altice USA, Dexter Goei, Michel Combes, Dennis Okhuijsen, Jérémie Bonnin, Raymond Svider, Mark Mullen, Charles Stewart, Victoria Mink, Abdelhakim Boubazine, Lisa Rosenblum, David Connolly, and the Underwriter Defendants, (collectively the "Section 11 Defendants").

121.    This claim is brought by Plaintiffs and on behalf of other members of the Class who purchased or otherwise acquired the Company's securities pursuant to or traceable to the Company's IPO. Each member of the Class acquired his, her, or its shares pursuant to and/or traceable to, and in reliance on, the Registration Statement. The Company is the issuer of the securities purchased by Plaintiffs and the Class. As such, the Company is strictly liable for the materially untrue statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate.

122.    The individual Defendants among the Section 11 Defendants each signed the Registration Statement, authorized the signing of the Registration Statement on their behalf, or agreed to act as nominee director in connection with the Registration Statement. As such, each is strictly liable for the materially inaccurate statements contained therein and the failure of the Registration Statement to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense. The individual Defendants each had duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement, and to ensure that they were true and accurate, that there were no omissions of material facts that would make the Registration Statement misleading, and that the document contained all facts required to be stated therein. In the exercise of reasonable care, the Individual Defendants should have known of the material misstatements and omissions

contained in the registration Statement and also should have known of the omissions of material fact necessary to make the statements made therein not misleading. Accordingly, the individual Defendants are liable to Plaintiffs and the Class.

123.    The Underwriter Defendants each served as underwriters in connection with the IPO. As such, each is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense. These defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They had a duty to ensure that they were true and accurate, that there were no omissions of material facts that would make the Registration Statement misleading, and that the documents contained all facts required to be stated therein. In the exercise of reasonable care, the Underwriter Defendants should have known of the material misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material facts necessary to make the statements made therein not misleading. Accordingly, each of the Underwriter Defendants is liable to Plaintiffs and the Class.

124.    This claim is brought within one year after Plaintiffs discovered and could have discovered the untrue statements and omissions in and from the Registration Statement, and within three years of the effective date of the Registration Statement. It is therefore timely.

125.    Plaintiffs acquired Altice USA common stock pursuant or traceable to the Registration Statement used for the IPO without knowledge of the material omissions or misrepresentations alleged herein.

126.     Plaintiffs and the Class have sustained damages, as the value of Altice USA common stock has declined substantially subsequent to and due to these Defendants' violations.

127.     By virtue of the foregoing, Plaintiffs and the other members of the Class are entitled to damages under Section 11 as measured by the provisions of §11(e), from the Defendants and each of them, jointly and severally.

## COUNT II
### Violations of §12(a)(2) of the Securities Act
### Against Defendant Altice USA and the Underwriter Defendants

128.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

129.     This cause of action is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2) on behalf of the Class, against Altice USA and the Underwriter Defendants. This is a non-fraud cause of action. Plaintiffs do not assert that defendants committed intentional or reckless misconduct or that defendants acted with scienter or fraudulent intent.

130.     By means of the defective offering documents, Altice USA and the Underwriter Defendants promoted and sold Altice USA stock to Plaintiffs and other members of the Class. Altice USA is liable as an issuer and was motivated by its financial interest in selling Altice USA common stock. It directed the Registration Statement to the investing public and the Underwriter Defendants sold and solicited sales of Altice USA stock to the investing public at the behest of Altice USA.

131.     The Underwriter Defendants are liable for selling and soliciting the sale of Altice USA stock to investors and were motivated by their fees and commission in doing so. They directed and distributed the Registration Statement to investors. Each of the Underwriter Defendants pitched and sold Altice USA stock to investors, through their approval and distribution

of the Registration Statement, their approval and use of the roadshow, and through direct communications with investors, including their own clients.

132.    The Registration Statement contained untrue statements of material fact, and/or concealed or failed to disclose material facts, as detailed above. The Defendants named in this cause of action owed Plaintiffs and the other members of the Class who purchased Altice USA common stock pursuant to the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

133.    The Defendants named in this cause of action, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Registration Statement as set forth above.

134.    Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, the untruths and omissions contained in the Registration Statement at the time Plaintiffs acquired Altice USA common stock.

135.    By reason of the conduct alleged herein, these defendants violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Plaintiffs and the other members of the Class who purchased Altice USA common stock pursuant to the Registration Statement sustained substantial damages in connection with their purchases of the stock. Accordingly, Plaintiffs and the other members of the Class who hold the common stock issued pursuant to the Registration Statement have the right to rescind and recover the consideration paid for their common stock, and hereby tender their common stock to the Defendants sued herein. Class members who have sold their common stock seek damages to the extent permitted by law.

## COUNT III
### Violations of Section 15 of the Securities Act Against
### Defendants Altice USA, Altice N.V., and the Individual Defendants

136.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

137.    This cause of action is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against Altice USA, Altice N.V., and the Individual Defendants.

138.    The Individual Defendants and Altice N.V. each were control persons of Altice USA by virtue of their ownership and control over Altice USA, or their positions as directors and/or senior officers of Altice USA. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Altice USA.

139.    Altice USA controlled the Individual Defendants and all of its employees.

140.    These Defendants were each critical to affecting the IPO, based on their signing or authorization of the signing of the Registration Statement, by voting to execute the IPO and by having otherwise directed through their authority the processes leading to the execution of the IPO.

141.    None of these Defendants made reasonable investigations or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate complete in all material respects. Had they exercised reasonable care, they could have known of the material misstatements and omissions alleged herein.

142.    This claim was brought within one year after the discovery of the untrue statements and omissions in the Registration Statement and within three years after the Company's securities were sold to the Class in connection with the IPO. It is therefore timely.

143.    By reason of the above conduct, Altice USA, Altice N.V., and the Individual Defendants are jointly and severally liable with and to the same extent as the Company pursuant to Section 15 of the Securities Action, 15 U.S.C. §77o.

### COUNT IV
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Against Goei and Altice USA

144.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

145.    This Count is asserted against Goei and Altice USA and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

146.    During the Class Period, Goei and Altice USA, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

147.    Goei and Altice USA violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Altice USA securities during the Class Period.

148.    Goei and Altice USA acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Altice were materially false and misleading; knew that such statements or documents would be issued or disseminated to the

40

investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Altice, their control over, and/or receipt and/or modification of Altice USA allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Altice USA, participated in the fraudulent scheme alleged herein.

149.    Goei, as CEO of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Deutsche Bank personnel to members of the investing public, including Plaintiffs and the Class.

150.    As a result of the foregoing, the market price of Altice USA securities was artificially inflated during the Class Period. In ignorance of the falsity of Goei and Altice USA' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Altice USA securities during the Class Period in purchasing Altice USA securities at prices that were artificially inflated as a result of Goei and Altice USA' false and misleading statements.

151.    Had Plaintiffs and the other members of the Class been aware that the market price of Deutsche Bank securities had been artificially and falsely inflated by Goei and Altice USA' misleading statements and by the material adverse information which Goei and Altice USA did not disclose, they would not have purchased Altice USA  securities at the artificially inflated prices that they did, or at all.

152.     As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

153.     By reason of the foregoing, Goei and Altice USA have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Deutsche Bank securities during the Class Period.

### COUNT V
**Violation of Section 20(a) of the Exchange Act against Goei, Drahi, and Altice N.V.**

154.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

155.     During the Class Period, Goei, Drahi, and Altice N.V. participated in the operation and management of Altice USA, and conducted and participated, directly and indirectly, in the conduct of Altice USA's business affairs. Because of their senior positions, they knew the adverse non-public information regarding Altice USA's business practices.

156.     As officers, directors and/or controllers of a publicly owned company, Goei, Drahi, and Altice N.V. had a duty to disseminate accurate and truthful information with respect to Altice USA's financial condition and results of operations, and to correct promptly any public statements issued by Altice USA which had become materially false or misleading.

157.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Altice USA disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Altice USA to engage in the wrongful acts complained of herein. Goei, Drahi, and Altice N.V. therefore, were "controlling persons" of Altice USA within the meaning of Section 20(a) of

the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Altice USA securities.

158.     Each of Goei, Drahi, and Altice N.V., therefore, acted as a controlling person of Altice USA. By reason of their controlling stake, senior management positions and/or being directors of Altice USA, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Altice USA to engage in the unlawful acts and conduct complained of herein. Goei, Drahi, and Altice N.V. exercised control over the general operations of Altice USA and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

By reason of the above conduct, Goei, Drahi, and Altice N.V. are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Altice USA.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A. Declaring this action to be a class action pursuant and certifying Plaintiffs as representatives of the Class and his counsel as Class counsel;

B. Awarding Plaintiffs and the members of the Class damages, including interest;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including and attorneys' fees;

D. Awarding rescission or a rescissory measure of damages; and

E. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a jury trial.

Dated: October 7, 2020                          Respectfully submitted,

                                                **THE ROSEN LAW FIRM, P.A.**

                                                /s/Jonathan Stern
                                                Phillip Kim, Esq.
                                                Laurence M. Rosen, Esq.
                                                Jonathan Stern, Esq.
                                                275 Madison Avenue, 34th Floor
                                                New York, New York 10016
                                                Telephone: (212) 686-1060
                                                Fax: (212) 202-3827
                                                Email: pkim@rosenlegal.com
                                                Email: lrosen@rosenlegal.com

                                                *Lead Counsel for Plaintiffs*

                                                **GLANCY PRONGAY & MURRAY LLP**
                                                Lesley F. Portnoy (LP-1941)
                                                230 Park Ave., Suite 530
                                                New York, New York 10168
                                                Telephone: (212) 682-5340
                                                Facsimile: (212) 884-0988
                                                lportnoy@glancylaw.com

                                                **THE SCHALL LAW FIRM**
                                                Brian Schall, Esq.
                                                1880 Century Park East, Suite 404
                                                Los Angeles, CA 90067
                                                Telephone: (424) 303-1964
                                                brian@schallfirm.com
                                                sherin@schallfirm.com

                                                *Additional Counsel for Plaintiffs*